SO ORDERED: April 01, 2005.



_____
**Anthony J. Metz III
United States Bankruptcy Judge**

THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| LEONA SEWELL, | ) | BANKRUPTCY NO: 03-20847-AJM-7 |
|   Debtor | ) | |
| AMERICAN GENERAL FINANCIAL SERVICES, INC. | ) | |
|   Plaintiff | ) | |
|   vs. | ) | ADVERSARY NO: 04-0096 |
| LEONA SEWELL, | ) | |
|   Defendant | ) | |
| LEONA SEWELL, | ) | |
|   Third-Party Plaintiff | ) | |
|   vs. | ) | |
| TRACY SEWELL, | ) | |
|   Third-Party Defendant | ) | |

1

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT**

This matter came before the Court for trial on February 25, 2005 upon the Complaint filed by the Plaintiff, American General Financial Services, Inc. ("American General") against the Defendant, Leona Sewell ("Leona"). In turn, Leona filed a third party complaint against Tracy Sewell ("Tracy"). The Court heard the evidence and the arguments of counsel and took the matter under advisement. The Court now makes its findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

*Findings of Fact*

1. American General provides financial services to consumers in Indiana, and its principal place of business is in Evansville, Indiana.

2. Leona and Tracy are divorced. Leona was the sole proprietor of TBS Auto Sales ("TBS") which purchased and sold vehicles. Tracy also worked at TBS. Both Leona and Tracy had done business with American General prior to November, 2003, and had a good payment history with respect to those previous transactions.

3. In her capacity as owner of TBS, Leona was familiar with the process by which a check to finance a vehicle would be issued, and the requirement that the lender's lien was to be noted on the certificate of title.

4. On November 12, 2003, Leona sought to borrow $9000 from American General in order to purchase (presumably for her TBS business) a 1995 Chevy Tahoe she had bid on at an automobile auction. To that end, Leona executed in favor of American General a promissory note and security agreement with on November 13, 2002 wherein she granted to American General a security interest in a 1995 Chevy Tahoe, VIN 1GNEK13K6SJ446371 (the "Vehicle"). Failure to obtain American General's written permission before selling or disposing of the Vehicle was an event of default under the security agreement.

2

5.      Prior to the execution of the note, American General evaluated Leona's creditworthiness, using its standard practices, and standard practices in the industry, placing particular reliance upon the good payment history established through numerous other contracts with both Leona and Tracy as well as the circumstances existing at the time of the note.

6.      American General issued a check payable to Leona and TBS that was 'lien stamped". A "lien stamped" check was one where, on the back of the check, the following stamped legend appeared and provided, in part:

   ENDORSEMENT acknowledges receipt of PAYMENT IN FULL for the vehicle described below and title is hereby GUARANTEED to the maker of said check...   You may negotiate this check only (1) when account is paid in full (2) when all liens have been satisfied and (3) when title had been mailed to the payer.

7.      Leona received possession of the vehicle and endorsed the check as "TBS auto / Leona Sewell". Despite having failed to mail the title to the vehicle to American General, Leona negotiated the check on or about November 18, 2002. Thus, at the time the check was negotiated, Leona had possession of the vehicle but had not mailed the title to American General so that it could perfect it's lien as to third parties by placing it's lien on the Vehicle's title and registering that title with the Indiana Bureau of Motor Vehicles.

8.      On November 16, 2001, Leona signed, as owner of TBS, a "Power of Attorney" whereby TBS appointed Tracy as its agent in order to complete bills of sale, conveyance of title, including endorsement of the certificate of title, and odometer statement and other similar documents in connection with the sale of cosigned vehicles. Nothing in the record indicated that the power of attorney had been revoked as of November, 2002. Thus, after the check from American General had been negotiated on November 18, 2002, Leona subsequently

3

delivered the vehicle to Tracy, to sell the vehicle as agent of TBS, despite the fact that she had not obtained American General's permission or consent to sell the vehicle.

9. Tracy, as TBS' agent, solicited a purchaser for the vehicle over several months. While soliciting a purchaser, Tracy made several payments on behalf of TBS to American General and at one point, approached American General to re-finance the loan in his name so that he could purchase the vehicle for himself.

10. Despite Tracy's payments, TBS' account became delinquent a number of times, and American General demanded that the vehicle be returned to it pursuant to the terms of the promissory note and security agreement. The vehicle was never delivered to American General and American General never received title to the Vehicle.

11. Tracy located a buyer for the vehicle on or before August 1, 2003. The vehicle was "sold" to Buck-I Auto Sales ("Buck -I") located in Ohio for the sum of $2000 and in exchange for another vehicle that Buck -I agreed to deliver to TBS. Title to the vehicle allegedly was delivered to Buck -I. Neither the vehicle given in exchange nor the $2000 was tendered to American General. Nor did TBS or Leona tender as replacement collateral the title to the vehicle given in exchange. Buck-I subsequently sold the Vehicle to a bona fide purchaser for value in September 2003.

12. Julie Camden, a witness for the Plaintiff who holds a car dealers' license and is familiar with automobile auctions, testified that the auction house from which Leona purchased the Vehicle should have placed either Leona's name or TBS's name on the title after she purchased the Vehicle. Leona testified that Tracy "got all of the paperwork" when the Vehicle was purchased at the auction and that she never had the title to the Vehicle.

13. Ms. Camden conducted a search for the Vehicle once it had been sold by Buck-I and was able to obtain a copy of the title history to the Vehicle from the Ohio Bureau of Motor

4

Vehicles. She found that as of September 9, 2002, (approximately two months before American General loaned Leona the money) William E. Oglesby was the owner of the Vehicle which was then sold to Buck -I on August 1, 2003. Buck - I in turn sold the Vehicle to Carl Mitchell on September 25, 2003, and he is the last owner listed on the title history as of December 9, 2004 the date the title history was run. Thus, according to the title history, neither TBS nor Leona were listed as owners on the title, and in fact, there was never an Indiana title issued for the Vehicle.

14. Ms. Camden added that, even if a buyer in the chain of title was a dealer, that dealer nevertheless was required to be listed as owner on the title. Because neither Leona nor TBS were on the title as owners, Ms. Camden was of the opinion that Leona or TBS were "skipping" or "jumping" title.

15. Leona filed her chapter 7 case three months on January 30, 2004, approximately three (3) months after the Vehicle was sold by Buck -I to Mitchell. American General has received neither title to the Vehicle, nor the proceeds of sale to Buck-I.

### *Conclusions of Law*

16. This Court has jurisdiction over this proceeding pursuant to *28 U.S.C. § 1334* and General Orders of the United States District Court for the Southern District of Indiana. This adversary proceeding constitutes a core proceeding under *28 U.S.C. § 157*(b)(2)(I).

17. American General claims that the amount owed to it by Leona is nondischargeable pursuant to §523(a)(2)(B) and §523(a)(6) of the Bankruptcy Code.[1]

---

[1] Although American General did not specifically plead nondischargeability under §523(a)(2)(A), language with respect to that section appears in the complaint and the elements of §523(a)(2)(A) were contained in its pre trial statement filed with the Court on September 17, 2004. The issue was tried by implied consent of the parties. See, *In re Richards & Conover Steel Co.*, 267 B.R. 602 (BAP 8th Cir. 2001); *In re Byers*, 312 B.R. 22 (Bankr. D. Mass. 2004).

5

18.　A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).

19.　Generally, Section 523(a)(2) of the Bankruptcy Code excepts from discharge a debt for money, property, services or an extension, renewal, or refinancing of credit to the extent obtained by fraud. If the fraud involves a *written* statement *regarding the debtor's financial condition,* it is excepted from discharge specifically by subsection 523(a)(2)(B). All other debts for money, property, services or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation or actual fraud are excepted from discharge by Section 523(a)(2)(A).

20.　Under §523(a)(2)(A), three distinct forms of conduct may lead to nondischargeability – false pretenses, false representations, and actual fraud. Regardless of what form of conduct is being alleged, a creditor generally under this section must prove (1) the debtor made the representation to the creditor; (2) the debtor knew the representation to be false when it was made, or made it which such reckless disregard for the truth so as to constitute a willful misrepresentation; (3) the debtor made the misrepresentation with the intent and purpose to deceive the creditor; and (4) the creditor's reliance on the misrepresentation was justifiable. *McClellan v. Cantrell*, 217 F.3d 80 (7th Cir. 2000); *In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995); *MBNA America Bank v. Hostetter (In re Hostetter)*, 320 B.R. 674, 680, n. 4 (Bankr. N. D. Ind. 2005).

21.　A debt arising from willful and malcious injury by the debtor to another entity or the property of another entity is nondischargeable under §523(a)(6), and this section has often thought to have included the type of conduct that can be described as an intentional tort.

Thus, American General must show that the damage to it resulted from an act of the debtor that was both willful and malicious; *In re Hopkins,* 82 B.R. 952, 953 (Bankr. N. D. Ill. 1988). The term "willful" means "deliberate or intentional," and "malicious" means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will." *In re Condict,* 71 B.R. 485, 487 (N. D. Ill. 1987). The United States Supreme Court has held that since this section is closely associated with conduct that constitutes an intentional tort, the conduct required under this section requires a deliberate injury, not just an intentional act that leads to injury. In other words, the debtor must have intended " the consequences of his act, not simply the act itself" *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).

22.    A debt arising from a knowing conversion of a secured creditor's property, thereby depriving the creditor of its security, can be nondischargeable under this section. *In re Iaquinta*, 95 B.R. 576 (Bankr. E.D. Ill. 1989). Further, business persons are frequently presumed to know that harm will result from conversion of a secured party's collateral and a debtor who actively participates in such a conversion is personally liable. *In re Nicoll*, 42 B.R. 87 (Bankr. N. D. Ill. 1984).

23.    Leona had dealt with American General on previous occasions and understood the process by which American General took collateral as security for the debt owed to it. Leona, as owner of TBS, also was familiar with the process by which a secured creditor's lien had to be noted on the certificate of title. The security agreement between Leona and American General granted to American General a security interest in the Vehicle, and the granting of the security interest gave American General a property interest in the Vehicle. Under the security agreement, Leona could not sell the Vehicle without American General's permission. The check given to Leona contained a legend on the back that clearly prohibited her from negotiating the check until she delivered title to the Vehicle to American General.

Leona cashed the check but failed to obtain American General's permission before selling the Vehicle and further failed to remit to American General the proceeds from the sale of the Vehicle. Leona further failed to produce the title after several demands by American General. The Court finds that Leona acted willfully, intentionally and maliciously and knew that her failure to deliver title or direct her agent to deliver title would impair American General's security interest in the Vehicle. She further knew or, given her experience as owner of TBS, should have known that the negotiation of the check without having sent American General the title was contrary to the directions contained on the back of the check and that the failure to deliver either the Vehicle or the proceeds from its sale was contrary to the security agreement. Thus, the Court concludes that the debt owed to American General is nondischargeable under §523(a)(6). [2]

24.    Leona repeatedly argues that Tracy received all of the paperwork after the Vehicle was purchased at the auction, and that she should not be held liable. However, Tracy acted as her agent, by the power of attorney conferred upon him, and his acts are attributable to her to the extent he acted within his authority. If he acted outside his authority, it will be for Leona to argue in another forum.

25.    Furthermore, Leona's third party complaint merely asks the Court to direct Tracy to turn over the Vehicle to American General, which this Court cannot due since the Vehicle has since been sold to a bonafide purchaser for value. The third party complaint does not ask that, in the event the debt is held to be nondischargeable as to Leona, she be given a judgment against Tracy. Since the Court cannot afford the only relief asked for by the Third

---

[2] There was no evidence presented at trial as to the outstanding amount of American General's loan or attorneys' fees. Thus, the Court has not included a sum certain in its judgment of nondischargeability; the state court in which the nondischargeability judgment will be enforced can determine those amounts.

Party Complaint (return of the Vehicle) the relief it will afford will be that as to Leona and American General; a determination that the debt owed by Leona to American General with respect to the Vehicle is nondischargeable under §523(a)(6). Because the Court finds the debt to be nondischargeable, it need not address American General's §523(a)(2) arguments.

### *Judgment*

26.   It is hereby ORDERED, ADJUDGED AND DECREED that the debt owed by Leona Sewell, the Defendant, to the Plaintiff, American General, shall be and hereby is a NONDISCHARGEABLE debt in this bankruptcy case. Leona Sewell, Third Party Plaintiff, shall take nothing by her Third Party Complaint against Tracy Sewell.

# # #

Distribution:
Edward Castaldo, Attorney for American General
Clyde Williams, Attorney for Leona Sewell
Tracy Sewell, Pro Se
United States Trustee